THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ROBERT C. NELSON, Appellant.

First Department, February 26, 1932.

*Jeremiah T. Mahoney* of counsel [*Phillips, Mahoney, Leibell & Fielding*, attorneys], for the appellant.

*John C. McDermott, Deputy Assistant District Attorney*, of counsel [*Thomas C. T. Crain, District Attorney*], for the respondent.

MERRELL, J.   The indictment under which the defendant was tried, in its first count, charged the defendant with the larceny of two ladies' bracelets of the value of $2,000 and $1,000, respectively, the property of one Verna Pearson.   This count of the indictment was withdrawn by the prosecution at the commencement of the trial.   By a second count of the indictment the defendant was charged with the crime of criminally receiving stolen property in that the defendant, at the county of New York, on May 27, 1930, bought, received, concealed, withheld and aided in concealing and withholding the chattels mentioned of the value as stated in the first count of the indictment, well knowing the said goods, chattels and personal property to have been feloniously stolen, taken and carried away against the form of the statute in such case made and provided.   At the trial of the defendant, which began in Court of General Sessions of the County of New York, Part IX, on June 25, 1931, one Richard Oliver, a member of the police force of the city of New York for twenty-one years, and attached to the detective division for about seventeen years, and acting as captain of the detective division, testified that he arrested the defendant at about six o'clock at night on May 27, 1930, as he was entering his place of residence at 2123 Vorhies avenue, Brooklyn.   Officer Oliver testified that he entered the defendant's apartment with him and then told him that he had a search warrant to look at the vault in which the police believed the defendant had stolen property; that he first asked the defendant how many vaults he had, and that defendant stated that he had a vault in the Bank of America, and that the defendant admitted that he had two vaults, one in Brooklyn and one in New York.   It was finally admitted by defendant and by his wife, with whom he was living, that he had the two vaults in the Bank of America, one in another bank near the Borough Hall in the city of Brooklyn, and that his wife had two safe deposit boxes, one at the National City Bank, Kings Highway branch, and the other at Sheepshead Bay, with the Guardian National Bank at that place.   The safe deposit boxes of defendant's wife to whom he had been married for twenty-seven years, were originally in her marriage name, but some three or four years prior thereto one of these boxes had been changed to the maiden name of defendant's wife.   No satisfactory explanation was offered with reference to the change of the safe deposit box in the name of defendant's wife from her marriage name to her maiden name.   At this interview the defendant and his wife turned over the keys to their various safe deposit boxes, and subsequently said boxes were brought to police headquarters and opened and the contents taken therefrom and labeled.   The contents of these boxes con-

sisted of 3,000 pieces of jewelry which the defendant admitted to be of the value of $150,000. An advertisement was inserted in the newspapers by the police department as to the recovery of these various articles of jewelry and in response thereto the complainant, Verna Pearson, then residing at Margate, in the State of New Jersey, visited police headquarters and identified two bracelets which upon the trial were marked People's Exhibits 2 and 3, as property stolen from her on the night of February 26, 1930. Miss Pearson testified that on the night in question she had left her home at Margate at about half-past six o'clock returning sometime after nine o'clock at night; that the two bracelets in question along with several other articles of jewelry had been left by her in a tin box which had been concealed on top of a ledge over a window in her room, behind curtains. When Miss Pearson returned to her room the same night she found two suitcases upon the bed containing clothing, and upon investigation found that the tin box containing her jewelry was gone. The two bracelets in question which Miss Pearson identified as among the property stolen from her on the night of February 26, 1930, were a diamond bracelet set with thirty-two diamonds of the value of about $2,000 and a sapphire bracelet, also containing some diamonds, of the value of $1,000. Miss Pearson testified that she purchased the diamond bracelet of a jeweler by the name of Batchelor on the board walk at Atlantic City in the fall of 1924, and that the sapphire bracelet had been a gift to her about ten years before the trial. She also testified that the sapphire bracelet on three or four occasions had been taken to the jeweler Batchelor at Atlantic City for repairs. The People at the trial swore as a witness a man by the name of Joseph J. Matz, who testified that he had examined the diamond bracelet and that he himself had set the diamonds for the jeweler Batchelor of Atlantic City. Matz positively identified the diamond bracelet, People's Exhibit 2, by means of certain imperfections existing in the fifth stone from each end of the bracelet. He testified that he recalled distinctly mounting this bracelet and that it was of a peculiar style of mounting and his own handiwork and that he recalled the imperfect stones, the fifth and sixth one from each end of the bracelet. Matz testified that he had been in the jewelry business for twenty-two years, and during that time had been engaged in buying and selling diamonds and in setting the same; that the bracelet in question he had consigned to the jeweler Batchelor at Atlantic City. Matz testified that he made a business of bracelets for Batchelor and among them the bracelet in question, consisting of thirty-two diamonds, and that he was able to identify the same positively as his own workmanship, and that by the use

of a magnifying glass he had positively identified it at police headquarters a short time prior to the trial.

On the part of the defense the defendant testified that the 3,000 pieces of jewelry found in the four or five deposit boxes had been received by him mostly at race tracks where he had operated as a bookmaker and had received them from " suckers " who were out of money and in consideration of loans which he made. He testified that he had at that time goods running into many thousands of dollars in the hands of various dealers in Chicago, Hot Springs, Ark., and elsewhere. It appeared that the defendant had with a man by the name of Donnelly in Chicago on memorandum $15,000 to $20,000 worth of jewelry consisting of rings and bracelets; that he also had $15,000 worth of " stuff " out on memorandum to " a little fellow in Hot Springs, Arkansas, John Bowes," and " a big choker," which cost him $11,000, to Schwartz on Broadway, and that also a man by the name of Schepps had $20,000 worth of " stuff." The defendant on being interrogated by Officer Oliver and at the trial stated that he never kept any books of account of any of his transactions, but carried them all in his head, and that he personally remembered each piece of jewelry which had come into his possession. As to the diamond bracelet, the defendant claimed that he delivered a quantity of diamonds to a man by the name of Schneider to be set, and a witness by the name of Schwenke testified at the trial that he himself had set the thirty-two-diamond bracelet, and produced a memorandum book in which he claimed he had entered a charge for such setting against his employer, Schneider. Schwenke testified that the diamonds in question were delivered to his employer, Schneider, whereas the defendant testified that he had delivered them to Schwenke himself. Schneider was not produced as a witness, nor were Schneider's books of account produced. In a memorandum book produced by Schwenke was an entry under date of December 31, 1930, of having set a thirty-two-diamond bracelet for his employer. After being interviewed by the defendant Schwenke wrote on the opposite page of the book that he had set a platinum bracelet for Nelson (the defendant) on December 30, 1930. As to the sapphire bracelet, a man by the name of Ned Lynch appeared as a witness in behalf of defendant. The defendant had previously described Ned Lynch as the person from whom he had obtained the sapphire bracelet and who, he told the police officer, was a tout at the race track. Lynch claimed to be a man of a large amount of wealth, owning houses in Florida, New York and elsewhere, and testified that a year before his marriage and in November, 1922, he had purchased the sapphire bracelet from Schepps, Inc., doing business

in the Strand Theatre Building, between Forty-seventh and Forty-eighth streets, on Broadway. He testified that he afterwards obtained a loan of $700 from the defendant and had delivered the bracelet to him as security. The testimony of Lynch throughout was contradictory, and was quite unworthy of any credence whatever. The People failed to produce the jeweler Batchelor of Atlantic City from whom the complainant had purchased the diamond bracelet. The evidence, however, showed diligent effort on the part of the People to locate Batchelor and that at the time of the trial his attendance could not be procured, he being on a western trip. When Officer Oliver told the defendant, after the articles of jewelry had been taken from him, that Batchelor had been to headquarters and had identified the two bracelets in question, the defendant stated that he knew Batchelor well, and that he was a receiver of stolen goods, and that he himself put no reliance upon him whatever. It is quite possible that the inability of the People to produce Batchelor resulted from some connection between the defendant and the absent witness.

After reading all of the testimony in the case, only a small part of which has been referred to, and under the circumstances of this defendant having in his possession 3,000 pieces of jewelry, besides large consignments in different parts of the country, and without keeping a single scrap of paper or book of account of his various dealings, we have no doubt that he was a " fence " and a receiver of stolen property. In any event, the evidence was entirely sufficient to justify the jury in determining the questions of fact presented by the evidence in favor of the People. We think there is no question as to the guilt of the defendant, and that the judgment of conviction was right.

A point is made by the defendant that he was convicted for common-law receiving of stolen property, and that the jury upon the proofs given at the trial had found him guilty under another provision of the Penal Law making a dealer guilty who received property without instituting a reasonable inquiry and investigation as to whether the property was stolen or not. The defendant relies largely upon the case of *People* v. *Brown* (191 App. Div. 708), where the Appellate Division, Second Department, held that the defendant in that case had been improperly convicted of a crime not charged in the indictment. The difficulty with the position of the defendant in that respect is this: The defendant here was clearly charged with a violation of section 1308 of the Penal Law for receiving stolen property, rendering him guilty of a felony. That is the only charge against him contained in the indictment. The case was submitted to the jury upon the theory that the defend ·

ant was a dealer, and that it was his duty to overcome the presumption created by the statute (Penal Law, § 1308). No exception to such submission seems to have been taken. The People urge that where the evidence shows, as it did in this case, that this defendant was a dealer in merchandise and property, and where it appears, as it appeared in this case, that the defendant had failed to make a reasonable inquiry that the person from whom he had received the property in question had stolen or misappropriated the property, the defendant was presumed to have bought or received such property knowing it to have been stolen or misappropriated. Section 1308 of the Penal Law, so far as applicable to the present case, reads as follows: "A person who buys or receives any property knowing the same to have been stolen or obtained in any way under circumstances which constitute larceny or who conceals, withholds, or aids in concealing or withholding any property, knowing the same to have been stolen, * * * is guilty of a felony, * * *. *A person who being a dealer in or collector of any merchandise or property, * * * fails to make reasonable inquiry that the person selling or delivering any stolen or misappropriated property to him has a legal right to do so, shall be presumed to have bought or received such property knowing it to have been stolen or misappropriated. This presumption may however be rebutted by proof.*" (Amd. by Laws of 1914, chap. 93; Laws of 1916, chap. 366; Laws of 1920, chap. 570; Laws of 1921, chap. 429; Laws of 1926, chap. 707; Laws of 1928, chap. 354, in effect July 1, 1928.) (Italics are the writer's.)

The case of *People* v. *Brown* (*supra*) is clearly distinguishable. In that case the defendant was convicted on September 15, 1919, of the crime of having criminally received stolen property. As the statute stood at that time there were two degrees of the crime of criminally receiving stolen property, namely, if the property was of the value of more than fifty dollars then the defendant was guilty of the crime of criminally receiving stolen property in the first degree, and if the property received was of the value of fifty dollars or less, then the defendant was guilty of criminally receiving such property in the second degree. At that time the statute did not contain the provision with reference to a dealer in or a collector of merchandise; the portion of the statute italicized above was not the law, and the indictment was predicated upon a common-law count. In each of the years 1920, 1921 and 1926 the statute was amended in different ways, and in 1928 the law was amended so as to read as hereinbefore quoted. The last amendment became effective July 1, 1928, or nine years after the conviction of the defendant in the case of *People* v. *Brown*. That amendment added the last two sentences to the statute, which sentences make pro-

vision as to the presumption following from a failure to make reasonable inquiry by a dealer in any merchandise or property, and the last provision being that the presumption may be rebutted by proof. The defendant admitted at the trial that for thirty years he had been a dealer in jewelry which he had received mostly at race tracks and had collected from various sources. On the trial of this case Officer Cliver testified that in his conversation with the defendant when the safe deposit boxes were opened he asked him, " Who are the people that gave you most of this stuff at the race track? " and that the defendant replied, " I didn't question them," and that the officer then asked defendant, ",Didn't you think it might be stolen, or something like that? " and that the defendant replied, " Yes, might be hot, for all I know." The undisputed evidence in this case very clearly shows that defendant made no investigation whatever, but must have been convinced that the property which he received was " hot," as he expressed it, or was stolen property.

Police Inspector John A. Lyons was called as a witness for the People and testified at the trial that he questioned defendant, at police headquarters when the jewelry was displayed, and asked defendant: " Bob, how did you come in possession of all this jewelry? " and that defendant replied: " I have been buying jewelry for thirty years, both in New York and Chicago, and I make a book at the track, and I buy it from dealers, and I buy it from suckers who go broke down there, and I accept jewelry as collateral for loans from men who are broke." Inspector Lyons then asked defendant what he estimated the jewelry discovered was worth, and that defendant replied: "A couple of hundred thousand dollars." The inspector then asked defendant how long he had been buying it in large quantities, to which defendant replied: " I may buy $20,000 worth a year." The inspector testified that he then asked defendant: " Do you sell it? " to which defendant replied: " Yes, but at the present time the selling is very poor." Inspector Lyons then testified that he asked defendant: " Did it ever occur to you some of this property may be stolen property? " to which defendant replied: " That is quite possible. It may be hot stuff, may be swag, I don't know. I conduct no investigation." We thus have clear evidence that the defendant was a dealer in mer-chandise, and that when he received property which he admitted was quite possibly stolen, he failed to make any inquiry whatever as to whether the person who delivered the property to him had any legal right to do so, stating that while it was " quite possible " that the property was stolen property and that it might be " hot stuff, may be swag; " that " I don't know. I conduct no investi-

gation." The proven facts and admissions of defendant bring the case directly within the rule of evidence prescribed by the Legislature and give rise to the presumption that defendant received the jewelry in question knowing it to have been stolen, and render the defendant guilty of a violation of section 1308 of the Penal Law. There was no evidence given by defendant sufficient to rebut such presumption.

At the present time the statute provides but a single degree for the crime of criminally receiving stolen property. There are no degrees as heretofore existed. It is the contention of appellant that the statute makes two crimes, one for the common-law crime for criminally receiving stolen property, and the other one a separate statutory crime where such property is received by a dealer. We do not think the statute is susceptible of any such interpretation. It was well within the power of the Legislature to enact the provision of the statute with reference to the commission of the crime by a dealer and to place upon him the presumption arising from that fact. The statute, as thus amended, created no new offense, but simply prescribed a rule of evidence by which the defendant could be found guilty. (*People* v. *Adams*, 176 N. Y. 351; affd., 192 U. S. 585.) In *People* v. *Adams* (*supra*) the defendant was charged and was convicted for a violation of section 344-a of the Penal Code for keeping, occupying and using a place, building, room, etc., for policy playing. At that time it was provided by section 344-b of the Penal Code that the possession by any person, other than a public officer, of any writing, paper or document representing or being a record of any chance, share or interest in numbers sold, drawn or to be drawn in what is commonly called " policy," or in the nature of a bet, wager or insurance upon the drawing or drawn numbers of any public or private lottery, or any paper, print, writing, numbers or device, policy slip or article of any kind, such as is commonly used in carrying on, promoting or playing the game commonly called " policy," was presumptive evidence of possession · thereof knowingly and in violation of the provisions of section 344-a. The evidence in that case showed that when the defendant was arrested a large amount of papers was seized, some being those referred to in the sections of the Penal Code mentioned. It was the contention of defendant that sections 344-a and 344-b of the Penal Code, under which the indictment was found and the conviction had, were unconstitutional and void in that the defendant had been deprived of his property without due process of law in violation of both the Federal and State Con-

stitutions. As to the relations between section 344-a and section 344-b of the Penal Code, the Court of Appeals, by BARTLETT, J., wrote as follows (at p. 359): " Section 344-a creates the crime of which the defendant stands convicted; it is complete in itself and is in no way dependent upon the provisions of section 344-b. The latter section establishes a rule of evidence only."

At page 360 Judge BARTLETT further wrote: " Section 344-b provides that the possession by any person, other than a public officer, of certain papers used in carrying on, promoting or playing the game commonly called ' policy,' is presumptive evidence of possession thereof knowingly and in violation of the provisions of section 344-a. * * *

"As already stated, this section [§ 344-b] creates no offense, but prescribes a rule of evidence, subject to certain limitations."

Judge BARTLETT then quotes from the opinion of the Court of Appeals in *People* v. *Cannon* (139 N. Y. 32, 43) as follows: " ' It cannot be disputed that the courts of this and other States are committed to the general principle that even in criminal prosecutions the Legislature may, with some limitations, enact that when certain facts have been proved they shall be *prima facie* evidence of the existence of the main fact in question.' This principle has been approved in a number of States.

" The Legislature, in the section under consideration, has gone a step further and provided that the possession by any person, other than a public officer, of the various papers and writings used in carrying on, promoting or playing the game commonly called ' policy,' is presumptive evidence of possession thereof knowingly and in violation of the provisions of section 344-a. In other words, the Legislature has cast the burden of proof upon the person who has in his possession these incriminating papers. The fullest opportunity is afforded him to rebut this statutory presumption. The exercise of this power is clearly within constitutional limitations and calculated to aid the People in prosecuting persons engaged in this form of gambling."

The language of the Court of Appeals above quoted is peculiarly applicable to the case at bar where the Legislature, by the amendment effective July 1, 1928, and which has been italicized in the above quotation from section 1308 of the Penal Law, merely provided a rule of evidence making the receipt of property by a dealer who makes no inquiry whatever as to whether the person delivering it to him had a legal right so to do, presumptive evidence of knowledge on the part of the receiver that the property had been stolen or misappropriated. By the last sentence of the amended statute an opportunity is afforded the receiver to rebut such presumption.

Defendant here was, by his own admission, a dealer in merchandise. He admitted that the goods proven to have been stolen were received by him and that quite possibly said goods had been stolen. He further admitted that he conducted no investigation as to the legal right of the persons from whom he received the property to deliver it to him. There was no error committed by the trial court in charging the jury in this respect.

Much complaint is made by counsel for appellant as to the conduct of the justice presiding at the trial. We are convinced that there is no merit in such contention. In our opinion, the court, throughout the trial, was entirely fair with the defendant and was guilty of no improper conduct prejudicial to the defendant's rights. The charge, as a whole, was impeccable, and extremely fair to the defendant. We find no basis for the contention of defendant's counsel that the defendant was denied a fair trial. The defendant was clearly proven guilty of the crime charged beyond a reasonable doubt. We find no error occurring during the progress of the trial prejudicial to the defendant's rights.

The judgment of conviction should be affirmed.

FINCH, P. J., O'MALLEY, SHERMAN and TOWNLEY, JJ., concur.

Judgment affirmed.